**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **V.** | § | **NO. 1:17-CR-41** |
| | § | |
| **MONTARO ALABIMO WILLIAMS** | § | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE
JUDGE ON THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Pending before the undersigned is a "Motion to Suppress" (Doc. No. 18) filed by the Defendant, Montaro Alabimo Williams ("Williams").[1]   The United States filed a response to the Defendant's motion (Doc. No. 21), and the undersigned magistrate judge heard testimony and oral argument on July 12, 2017.  The undersigned finds that under the open fields doctrine, the first search was unlawful, but the second search was not.  Accordingly, the undersigned recommends granting Williams' "Motion to Suppress" in part.

**I. RELEVANT FACTS**

During the hearing on the instant motion held on July 12, 2017, Special Agent Jim Stinebaugh with the U.S. Fish and Wildlife Service (USFWS) testified to the following facts and supporting exhibits.  On March 26, 2015, Agent Stinebaugh interviewed Josh Monceaux who revealed that Williams fishes for and catches alligator snapping turtles in Texas and then sells them from his home in Elton, Louisiana.  Monceaux also reported that Williams stores the turtles in tanks

---

[1]        This motion is referred to the undersigned United States magistrate judge for review, hearing if necessary, and submission of a report with recommended findings of fact and conclusions of law.  United States v. Raddatz, 447 U.S. 667, 681-84 (1980); see also 28 U.S.C. § 636(b)(1)(B) and Local Rules for the Assignment of Duties to United States Magistrate Judge.

of water behind his residence and showed Agent Stinebaugh the exact location of the tanks on a google earth image of Williams' property.

In response, Agent Stinebaugh began surveillance on Williams' property. On April 2, 2015, he and Special Agent Matthew Bendele walked through the woods to the back of Williams' property and observed a blue tank (approximately 8 feet in diameter) and a white tank (approximately 12 feet in diameter and 4.5 feet tall) that were about 40 meters from the residence. They also observed a trash pile and turtle bones in between the pile and the tanks. Agent Stinebaugh testified to the lack of no trespass signs or fences around the tanks or forested area. He stated that the blue tank had a net with debris on top of it, but the white tank had no net cover and contained approximately two feet of murky water. Agent Stinebaugh heard a scratching noise from inside the tank, so he used a board to probe the water and pulled a turtle to the surface. He identified it as an alligator snapping turtle and estimated that it weighed 120 pounds. Agent Stinebaugh took photos of the tanks and turtle, which were admitted into evidence at the hearing. (See Govt. Exs. 1, 2.)

On May 24, 2015, an informant called Viola Guidry to purchase alligator snapping turtle meat. (Govt. Ex. 2.) Guidry did not sell turtle meat to the informant, but she told the informant that she knew an "Indian" guy that has turtle meat he might sell. (Id.) Agent Stinebaugh believed Guidry was referring to Williams. (Id.)

On August 2, 2015, video footage from the Piney Point Convenience Store in Jasper, Texas showed Williams and Kyle Battise entering and then exiting the store. (Id.) The video also shows Williams' boat attached to Battise's truck. (Id.) Texas Parks and Wildlife Department Dispatch notified Agent Stinebaugh the following day that Williams and Battise purchased fishing licenses at the Piney Point Convenience Store on August 2, 2015. (Id.)

On August 3, 2015, Agent Stinebaugh went back to Williams' property hoping to observe him return from Texas with alligator snapping turtles, but Williams' boat was already in the driveway upon his arrival. (Id.) Agent Stinebaugh conducted surveillance for four hours during this visit. (Id.) During that time, he looked into the white tank, but the water level was so low that two alligator snapping turtles were clearly visible at the bottom of the tank and only partially submerged. He estimated that these turtles weighed between 120 to 140 pounds each. He also observed an empty turtle shell near the tanks and a turtle leg bone, which he seized and later had tested at a forensic lab on August 19, 2015. The testing confirmed that the leg bone was indeed from an alligator snapping turtle. The Government introduced into evidence at the hearing pictures taken by Agent Stinebaugh of these additional two alligator snapping turtles.

On August 20, 2015, Agent Stinebaugh conducted surveillance again on Williams' home. (Id.) He took photos of a bandsaw, as well as the house and a boat trailer. (Id.) Monceaux reported that Williams used this bandsaw to cut up bait and alligator snapping turtles. On this same date, an officer working in an undercover capacity attempted to purchase turtle meat from Williams. (Id.) A female opened the door and told the officer that Williams was not home, and he did not have any turtle meat to sell. (Id.)

At no time during Agent Stinebaugh's investigation did he obtain a search warrant. He testified that it is not illegal to possess an alligator snapping turtle in Louisiana, but it is illegal to sell them. Based on witness interviews, he stated that he had reasonable suspicion that Williams caught alligator snapping turtles in Texas and then sold them from his home in Louisiana.

## II. RELEVANT LAW AND DISCUSSION

### A.  Search and Seizure

The Fourth Amendment prohibits "unreasonable searches and seizures" and assures "the right of the people to be secure in their persons, houses, papers, and effects."  U.S. CONST. IV.  "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.' "  California v. Ciraolo, 476 U.S. 207, 211 (1986).  Following the *Katz* standard, "[o]ur Fourth Amendment analysis embraces two questions. First, we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he [sought] to preserve [something] as private.... Second, we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable."  Bond v. U.S., 529 U.S. 334, 338 (2000).  A warrantless search is presumptively unreasonable unless the Government shows that the search fell within an exception to the warrant requirement, such as consent or plain view.  U.S. v. Aguirre, 664 F.3d 609, 610 (5th Cir. 2011).  The burden is on the Government to "bring the search within an exception."  Id. (citations omitted).

The "open fields" doctrine, first enunciated by the Supreme Court in *Hester v. U.S.,* 265 U.S. 57 (1924) states that an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home.  In *Hester*, the defendant dropped a jug of illegally distilled moonshine whiskey outside of his home as he attempted to flee from officers who were there without a warrant.  Hester, 265 U.S. at 58.  The Court held that protection afforded by the Fourth Amendment to the people in their "persons, houses, papers and effects," is not extended to open fields.  Id.

4

In *Oliver*, the Supreme Court reaffirmed the ruling from *Hester*. Oliver v. U.S., 466 U.S. 170, 178 (1984) (individuals have no socially recognized expectation that open fields will remain free from warrantless government view). Oliver planted marijuana on his secluded property and erected no trespassing signs and a fence to conceal the marijuana. Id. The Court found that the police trespassing onto Oliver's private land was not a search in the constitutional sense because their intrusion did not infringe upon personal and societal values protected by the Fourth Amendment. Id. at 182-183. The Court reiterated that an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home. Id. Consequently, exploration of open areas outside the curtilage does not constitute Fourth Amendment activity. Such areas may be entered by police even when probable cause is lacking. U.S. v. Scott, 544 F. App'x 303, 306 (5th Cir. 2013).

There are four non-exclusive factors to aid a court in determining whether a particular area lies within the curtilage of the home: (1) the proximity of the area claimed to be curtilage to the home; (2) whether that area is within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) any steps taken by the resident to obscure the area from observation by passersby. U.S. v. Ramirez, 145 F. App'x 915, 921 (5th Cir. 2005). In this case, the tanks were 40 meters from Williams' home. They were not in an enclosed area, but instead in the woods behind the home near a trash pile. Further, the tanks and the area where they were located were not being used for activities associated with the intimacies of home life. In addition, Williams had not taken any steps to fence the area, erect signs, or close off the top of the tank from viewing. As a result, this area, including the tanks, is subject to the open fields doctrine.

The open fields doctrine allows searches based upon only visual observation. U.S. v. Beene, 818 F.3d 157, 170 (5th Cir. 2016) (citing Husband v. Bryan, 946 F.2d 27, 29 (5th Cir. 1991) (Fourth Amendment violation to dig up land where warrant only authorized digging up of wells) (citing Donovan v. Dewey, 452 U.S. 594, 602–03 (1981) (Fourth Amendment applies to searches of mines)); see also Allinder v. State of Ohio, 808 F.2d 1180, 1186 (6th Cir.) (open fields doctrine limited to visual inspection and Fourth Amendment applies to search of apiaries in a field), app. dism'd, 481 U.S. 1065 (1987); see also U.S. v. Dunn, 480 U.S. 294, 302–05 (1987) ("there is no constitutional difference between police observations conducted while in a public place and while standing in the open fields," so the Fourth Amendment does not prevent officers from standing in a field and shining a flashlight into the defendant's barn); U.S. v. Beene, 818 F.3d 157, 163 (5th Cir. 2016) (2016) (dog sniff is not a search in an open field because it is not a physically invasive inspection).

The open field doctrine does not expand beyond mere visual inspections because a "physically invasive inspection is simply more intrusive than purely visual inspection." Bond v. U.S., 529 U.S. 334 (2000); see also Kee v. City of Rowlett, 247 F.3d 206, 217 n. 21 (5th Cir. 2001) ("[T]he open fields doctrine has not been expanded beyond observational searches."); Allinder v. Ohio, 808 F.2d 1180, 1185 (6th Cir.1987) ("In decisions following *Katz*, the Supreme Court has consistently adhered to the open field doctrine while at the same time recognizing that it is limited to sights seen in the open field." (internal quotation marks omitted)); U.S. v. Bellina, 665 F.2d 1335, 1343 n. 7 (4th Cir.1981) (when analyzing "observations made on [a] defendant's property ... [e]ach intrusion must be examined on its own peculiar facts and each must be analyzed in relation to whether the person challenging the intrusion had a legitimate expectation of privacy in the area or

thing observed.").  For example, the search of an uncovered boat well away from the defendant's house met the open fields doctrine.  U. S. v. Scott, 544 F. App'x 303, 306 (5th Cir. 2013).  However, searching an unlocked trunk of a parked junk car in a field did not meet the open fields doctrine.  See U.S. v. Torres, DR-06-CR-076-AML, 2007 WL 9655700, at *7 (W.D. Tex. May 11, 2007), aff'd, 346 F. App'x 983 (5th Cir. 2009).

In the instant case, the April 2, 2015 search went beyond mere observation when Agent Stinebaugh used a board to search the bottom of the tank because he could not observe with his naked eye anything through the murky water.  See Arizona v. Hicks, 480 U.S. 321, 325 (1987) (holding that moving stereo equipment in plain view a "few inches" to record the equipment's serial numbers constituted a search).  The second search on August 3, 2015, however, fits squarely within the open fields doctrine. There was no top on the tank, the turtles were not submerged under water, and they were clearly visible to Agent Steinbaugh without any assistance.  See U.S. v. Perry, 95 F. App'x 598, 602 (5th Cir. 2004) (contents of shed were plainly visible from the outside because it lacked a full wall on one side).

With regard to the turtle bone seized during this second search, "[i]t is well-established that under certain circumstances, officers may seize evidence in plain view without a warrant."  U.S. v. Perry, 95 F. App'x 598, 601 (5th Cir. 2004) (marijuana plants and clipboard seized during open fields search were in "plain view") (citing Horton v. California, 496 U.S. 128, 134 (1990)).  The plain view doctrine will support a warrantless seizure if: (1) the officer was lawfully in the position from which the object was plainly seen; (2) the object was in plain view; (3) the object's incriminating nature was immediately apparent–i.e., the officer had probable cause to believe the object was contraband or evidence of a crime; and (4) the officer had a lawful right of access to the

object itself.  U.S. v. Perry, 95 F. App'x 598, 601 (5th Cir. 2004).  The undersigned finds that the seizure in this case satisfies each of these elements.  The only question is whether this second search should be excluded as fruit of the poisonous tree, which is addressed in the next section.

The surveillance photos taken by Agent Stinebaugh's during his third visit on August 20, 2015 of the house, bandsaw, and boat trailer are also permissible pursuant to the open fields doctrine.

**B.  Exclusion of the Evidence**

"Under the 'fruit of the poisonous tree doctrine,' all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation."  U.S. v. Jaquez, 421 F.3d 338, 341 (5th Cir. 2005) (quoting U.S. v. Rivas, 157 F.3d 364, 368 (5th Cir. 1998)).  The evidentiary fruit must be obtained as a direct result of an illegal search  and only extends from the tree to the fruit if the fruit is sufficiently connected to the illegal tree.  U.S. v. Brookins, III, 614 F.2d 1037 (5th Cir.1980).  In other words, it is secondary evidence derived from the illegally seized evidence itself.  Wong Sun v. U. S., 371 U.S. 471 (1963).

Here, the April 2, 2015 search was unlawful because Agent Stinebaugh used a board to probe the water tank in order to search for evidence.  Such a physical intrusion is not merely observational activity or a visual inspection, rendering the open fields doctrine inapplicable.  Consequently, the pictures of the turtle discovered through those means and any testimony regarding the fruits of that search are excluded as fruits of the poisonous tree.

With regard to the August 3, 2015 search, the undersigned finds that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the first illegal

search.  On May 24, 2015, Guidry reported that an individual described as "Indian" might be selling alligator snapping turtle meat.  Agent Stinebaugh believed this "Indian" was Williams.  On August 3, 2015, Texas Parks and Wildlife dispatch informed Agent Stinebaugh that Williams purchased a one day fishing license in Jasper, Texas.  As a result, Agent Stinebaugh conducted surveillance at Williams' home where he observed the skeletal remains and two alligator snapping turtles in plain view.  As Agent Stinebaugh obtained this evidence four months later and independently of the April 2, 2015 search, it should not be suppressed.

## III. <u>RECOMMENDATION</u>

Evidence from the first search conducted on April 2, 2015, by Agent Stinebaugh should be exlcuded as it was obtained without a warrant and not pursuant to the open fields doctrine.  However, the second search conducted on August 3, 2015, was lawful pursuant to the open fields doctrine and the evidence obtained as a result of that search should be admissible.  Consequently, the district court should **GRANT** the Defendant's "Motion to Suppress" (Doc. No. 18) **IN PART** and exclude all evidence seized as a result of the search conducted on April 2, 2015.

## IV. <u>OBJECTIONS</u>

Pursuant to 28 U.S.C. § 636(b)(1)(c) (Supp. IV 2011), each party to this action has the right to file objections to this report and recommendation.  Objections to this report must (1) be in writing, (2) specifically identify those findings or recommendations to which the party objects, (3) be served and filed within fourteen (14) days after being served with a copy of this report, and (4) no more than eight (8) pages in length.  <u>See</u> 28 U.S.C. § 636(b)(1)(c); FED R. CIV. P. 72(b)(2); Local Rule CV-72(c).  A party who objects to this report is entitled to a *de novo* determination by the United States

District Judge of those proposed findings and recommendations to which a specific objection is timely made.  See 28 U.S.C. § 636(b)(1)(c); FED. R. CIV. P. 72(b)(3).

A party's failure to file specific, written objections to the proposed findings of fact and conclusions of law contained in this report, within fourteen (14) days of being served with a copy of this report, bars that party from: (1) entitlement to de novo review by the United States District Judge of the findings of fact and conclusions of law, (see Rodriguez v. Bowen, 857 F.2d 275, 276–77 (5th Cir. 1988)), and (2) appellate review, except on grounds of plain error, of any such findings of fact and conclusions of law accepted by the United States District Judge.  See Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1428–29 (5th Cir. 1996).

SIGNED this 27th day of July, 2017.

Zack Hawthorn
United States Magistrate Judge